# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Crim. No. 07cr10249-NG |
| | ) |
| JOSE RAMON ALIX, et al. | ) |
| Defendant. | ) |

GERTNER, D.J.

## MEMORANDUM-RE-MOTION TO SUPPRESS
June 30, 2009

## I.    INTRODUCTION

Defendants Jose Ramon Alix ("Alix"), Maximo Siri ("Siri"), and three others, are charged with conspiracy to possess and distribute cocaine and oxycodone.[1] Their arrests were the culmination of an investigation of Edwin Canelo ("Canelo") that began in June 2006. Canelo was allegedly the dealer of large quantities of oxycodone and cocaine in Lynn, Massachusetts.

On May 23, 2007, Drug Enforcement Administration ("DEA") agents began a wiretap of Canelo's phone. Shortly thereafter, on June 5, 2007, a car driven by Siri, with Alix as the passenger, was stopped by Massachusetts State troopers ostensibly for a traffic violation. In fact, the DEA engineered the stop as a "traffic stop" to enable them to inspect the car and its occupants to the maximum extent without disclosing the new wiretap and the ongoing Canelo investigation.

Accounts of the total duration of the stop are inconsistent, with estimates ranging from between thirty-five minutes to as long as forty-five minutes to an hour. (The state trooper was told by the DEA not to write a report that might well have clarified the issue.) During the stop, Alix, the passenger, was ordered out of the car, while the driver sat at the wheel. Alix was then

---

[1] Oxycodone is a Schedule II narcotic analgesic and is widely used in clinical medicine. It is marketed either alone as controlled release (OxyContin®) and immediate release formulations (OxyIR®, OxyFast®), or in combination with other nonnarcotic analgesics such as aspirin (Percodan®) or acetaminophen (Percocet®).

pat-frisked, and, although there was no reasonable basis to suspect that he was armed, backup officers were called.  Another officer frisked Alix a second time, and finally, Siri was ordered out of the car and pat frisked.  While the car itself was not searched, the stop yielded 1,043 oxycodone pills (found twenty feet away from where the vehicle was located) and a 1/4 kilogram of cocaine (which fell out of Siri's pant leg when he exited the car.)  At the direction of the DEA, the state troopers issued a traffic citation for "following too closely" and for speeding.  Later, on June 20, 2007, agents executed a search warrant in Siri's apartment, finding 1,500 oxycodone pills and more than $44,000 in cash.  Siri and Alix were arrested shortly thereafter.

Defendants Alix and Siri filed this motion to suppress, challenging the stop on June 5, 2007.  Defendants argue that all evidence obtained as a result of the vehicle stop -- the pills and the cocaine -- must be suppressed because (1) the state trooper lacked probable cause to stop the vehicle, and (2) the seizure was unconstitutional in scope and duration.  The government claims that the stop is justified because there was (1) evidence supporting probable cause in connection with the traffic violation, and (2) evidence supporting reasonable suspicion in relation to the drug investigation.  They also counter that the stop was appropriate in scope and duration.

The government produced two witnesses, Special Agent David M. DiTullio ("DiTullio") of the Drug Enforcement Administration, who was the case agent, and Massachusetts State Trooper Gary Berlo ("Berlo").  A hearing was held over two days.

While I find that there was no basis for a motor vehicle stop, there was reasonable suspicion to believe that drugs would be found in the car.  The Supreme Court's decision in Whren v. United States, 517 U.S. 806 (1996), which legitimized pretextual traffic stops so long as there is an objective basis for the stop, does not obviate the need for this Court to evaluate the

credibility of the testifying officers.  "Pretext" after all, does not mean that officers can testify

about traffic violations when the record suggests they did not happen.  In this case, testimony

about the traffic violation is so contrived, so little supported by the evidence, so shot through with

inconsistencies, I cannot believe it provided an objective basis for the stop at all.

At the same time, I do find there was reasonable suspicion to stop the vehicle for drugs

based on the facts then known to the DEA -- although they are facts different from those the

government highlights.  I have considered the calls overheard on Canelo's phone between May 24

and May 31.  However, I find that a critical call, one occurring just before the stop, was not

known to the officers from either the Massachusetts State Police or the DEA, notwithstanding the

sworn testimony to the contrary.

Perhaps because the officers were supposed to have been executing a traffic stop, even

though their real goal was a narcotic investigation, the conduct of the search was problematic.

They were clearly pushing the envelope, doing just about as much as they could do without

revealing the true purpose of their acts.  Evaluating the stop post hoc for what it was, a drug stop

based on reasonable suspicion, I find that its duration and scope far outstripped its rationale.  I

**GRANT** the defendants' motion to suppress with respect to the fruit of that search, namely the

cocaine that fell from Siri's pant leg when he exited the car.

However, I **DENY** the defendants' motion to suppress with respect to the oxycodone pills

found by the side of the road.  The pills had been abandoned; neither defendant claimed ownership

at the time of the stop or thereafter.  And since the stop was lawful, the government surely can

argue at trial that the location of the car, coupled with other admissible evidence, suggests that the

pills belonged to the defendants.

II.   **FACTS**[2]

DiTullio testified that the DEA had an ongoing investigation of Canelo, a suspected dealer of oxycodone and cocaine, beginning in June 2006.  He did not provide the Court with details about that investigation, why Canelo was its focus, or who else was identified.[3]  A wiretap of Canelo's phone began on May 23, 2007.

The procedures for reviewing overheard conversations are significant.  The conversations were monitored by contract workers for the DEA, McNeil Technologies, Inc. ("McNeil").  The call would be overheard by a contract worker, as well as recorded on the computer.  If the calls were in another language -- here, Spanish -- contract workers would translate them, their translation reviewed by a supervisor.  If the phone number called did not register on the wiretap or a pen register, the worker would try to identify the voice, based on prior calls.  No information was provided as to whether the contract workers were trained in voice identification procedures.  They plainly had no contact with the investigation except for monitoring wiretapped calls.  The conversation would be transcribed, a synopsis prepared, and then made available to whatever agents were in the "wire room" as well as to surveillance agents in the field.  At times, DiTullio would be present in the "wire room," and would be apprised of the call.  In addition, he would read the synopses and the transcripts on a daily basis.  Sometimes, however, he did not receive the synopses or transcripts until the day after the calls being monitored in that time period.

---

[2] These facts derive from the Court's notes and the unofficial transcript.

[3] An affidavit by DiTullio was filed in connection with the complaint in this case and in support of various search warrants, but was not made a part of the record of this motion to suppress.  In any event, the affidavit describes the controlled drug purchases with Canelo, the surveillance of Canelo, and the information agents gleaned from cooperating sources about Canelo.  While the agents believed that Canelo had a New York source, and had some reason to connect Alix to Canelo, the affidavit does not parse out what was known as of June 5, 2007, or its basis.

### A.   Calls on May 24, 29 and 31

There were four calls between May 24 and May 31 involving Canelo and apparently, his drug supplier.  It should be noted that DiTullio conceded that the officers did not identify either Alix or Siri as the individuals on the phone with Canelo until <u>after</u> the June 5, 2007, stop.[4]

1.   <u>May 23, 2007, at 9:15 p.m.</u>   (Exhibit 1):   Canelo calls a number whose subscriber is identified as "Jose Rodriguez."  Canelo is apparently asking if a supply of oxycodone had come in which he could purchase.

2.   <u>May 24, 2007, at 10:36 a.m.</u>   (Exhibit 2):   Canelo receives a call from "Jose Rodriguez," apparently discussing plans to deliver two kilograms of cocaine to Canelo.

3.   <u>May 24 at 8:59 p.m.</u>        (Exhibit 3):   Canello calls "Jose Rodriguez" apparently inquiring about a delivery that was to take place shortly.  "Jose Rodriguez" reports that he sent "the black guy" to Canelo and he was on his way.

4.   <u>Surveillance of Canelo's home (419 Broadway, Lynn, Massachusetts.):</u> Surveillance agents report that they saw a gray Audi SUV arrive at Canelo's house "after this [the 8:59 p.m.] call."  The individual from the car went into Canelo's house and then left it after a short time.  The SUV was registered in the name of "Luis Alix," who agents later determined to be the brother of the defendant Jose Ramon Alix.[5]  Between the telephone calls and surveillance, DiTullio testified that

---

[4] Some of the exhibits identify the caller or the individual being called as "Alix" but the witnesses agreed that this was not known until after the stop.

[5] The record is not clear as to when this relationship was revealed.  In any event, by the June 5 surveillance at the Harrison County Courthouse, the defendant Alix is linked to the gray Audi SUV.

he believed two kilograms of cocaine were dropped off to Canelo's residence by the person in the gray Audi SUV.

5.   <u>May 29 at 11:21 a.m.</u>       (Exhibit 4)**:**     Canello calls, asking "Jose Rodriguez" if there is any good news.  Jose Rodriguez indicates that his sources were supposed to get him something.  He reports that he will be going to Santo Domingo in two weeks.  DiTullio testifies that this call was about oxycodone because cocaine had been delivered to Canello two days before.

6.   <u>May 31, 8:24 p.m</u>       (Exhibit 5):     Because of a mechanical glitch, the number of the caller to Canelo was not identified.  Contract employees for McNeil indicate that the caller was the same "Jose Rodriguez" as before, although there was no evidence about how they made the identification.  The caller reports that he will be sending a quantity of pills to Canelo on Tuesday, June 5.  The caller tells Canelo to call on Tuesday so that the drugs can be delivered.

**B.     June 5 Surveillance and Stop**

**1.     Harrison County New York Courthouse**

DiTullio made the decision to initiate surveillance at the New York courthouse where Alix would be in the early morning of June 5 (to deal with a motor vehicle infraction).  Again, there was no indication in the record as to why that surveillance was commenced, only that unnamed sources somehow linked Alix to the Canelo investigation.

At the Harrison County courthouse, officers observed a gray Audi SUV and identified Alix and Siri as its passengers.  The officers effected the identification after the two went into the courthouse and showed their identification to court personnel.  Alix was also identified "via his

NY DMV photo as well as a 2006 booking photo" (Exhibit 7).  DiTullio matched the registration

of the SUV with the registration of the car seen at Canelo's home on May 24, 2008.

DiTullio was kept up to date by the New York officers following Alix and Siri as they left

the courthouse.  DiTullio joined in the surveillance as the car approached the Connecticut-

Massachusetts border.

### 2.      June 5 Call at 12:49 p.m. (Exhibit 6):

At 12:49 p.m., Canelo placed a call to what the contract workers called "UM"

(Unidentified Male).  The number called was different from the "Jose Rodriguez" number that

had appeared on the earlier calls; no one in the monitoring room had seen it before.  The contract

workers identified the voice as someone whom Canelo had spoken with before, but, as described

above, no one put a name to the voice until after the stop.  The call was in Spanish.

The person that Canelo called indicated that he was with "Alex."  Canelo said that he

would be at the house in fifteen minutes and inquired about "how many" the individual had.

There was background discussion in which UM asks "Alix, how many?" and the answer, "544,"

is overheard.  Canelo then asked, "Are you bringing me something," and UM says, "No."  The

government argues that this call was about the imminent delivery of drugs, that Alix was bringing

a quantity of pills and that Canelo had arranged for Siri to bring some as well.  Siri apparently did

not.

The 12:49 p.m. call was highlighted by the government during its presentation.  DiTullio

claims that it was this call that caused him to arrange for a motor vehicle stop of Siri's car with

the state troopers and that, at the very least, buttresses the officers' reasonable suspicion that drugs were in the car.[6]

But the record suggests that the DEA agents never heard that call before Siri's car was stopped.

(A)    Logs from the state police suggest that Berlo was alerted to the Alix-Siri car as early as 8:30 a.m. when he was tasked with becoming part of the DEA investigation. (Exhibit 9.) And Berlo's task was not ambiguous:  He testified that during the morning of June 5, surely before the 12:49 p.m. call,  Lieutenant Gill told him the DEA wanted him to stop a motor vehicle for them.

(B)    The incriminating call was received at 12:49 p.m.; the traffic citation was issued at 1:30 p.m. which, according to Berlo, was the last thing he did before the car was allowed to go

---

[6] The Assistant United States attorney questioned DiTullio in chronological order and by his questioning suggested that the 12:49 p.m. call preceded and was known to DiTullio before the stop.  DiTullio is explicit: "Because at that time we had been conducting surveillance in New York and this phone call comes about after we're conducting surveillance on a car from New York and they're talking about the amount of pills that are coming up to Massachusetts."  The AUSA asks the question more directly:

    Q:    "[W]hy do you believe that?
    A:    "In referencing this June 5th phone call, intercepted call."

And he reiterates it was the June 5 call together with the surveillance that triggered the arrest:

    Q:    "[Y]ou had decided to stop the car before the June 5th phone call was intercepted?"
    A.    "Before the June 5th phone call was intercepted, no. . . . We wouldn't have known the car was even in existence before the June 5th, we wouldn't have known it was coming from New York to Massachusetts before that phone call specifically."

    On cross examination, defense counsel tried to bring out the extent of the surveillance before the car passed the Massachusetts border, suggesting that the decision to stop had been made before the 12:49 p.m. call. DiTullio would have none of it:  "[I]sn't it fair to say that you had decided to have the car stopped prior to the interception of that call?"  "No," DiTullio insisted.  The Massachusetts State police were getting their direction from the DEA, so that "when we determined that we believed there were drugs in the vehicle, that's when we decided to do a marked motor vehicle stop."  He even insisted that he saw the synopsis or translation in Exhibit 6 <u>before</u> he stopped the car.

on its way.  If the duration of the stop -- from the moment that Berlo stopped the car to the moment he wrote the citation -- was thirty to forty-five minutes as Berlo noted,[7] then the 12:49 p.m. call and the stop were taking place, at best, simultaneously.

In fact, the time required to overhear the 12:49 p.m. call, analyze it, and communicate with DiTullio are inconsistent with the claim that this provided the basis for the traffic stop. DiTullio was not monitoring the calls directly.  He was on the surveillance team, not in the wire room.  He received his information from the person who was conducting the telephone monitoring at a different site.  In the period between the 12:49 p..m. call and the stop, contract workers had to go through the steps described above to get the information to DiTullio.

(C)     Two reports, written immediately after the stop, say nothing about this 12:49 p.m. call, although they mention a call subsequent to the traffic stop.  Mot. to Suppress, Exhibits A, F (document # 60-2).

I find that the June 5, 2007, 12:49 p.m. call was not known to DiTullio before the decision to stop.  I am troubled by the government's reliance on it.

### 3.      The Stop

DiTullio informed Lieutenant Gill and Trooper Stephen Racki ("Racki") that he *wanted* state police to stop the Alix-Siri car.  Racki conveyed the information to Berlo.  Indeed, DiTullio was speaking with Racki all during the stop.  The state troopers were told that they were not to arrest the individuals in the car so as not to compromise the existing warrant and investigation

---

[7] In fact, as described below, some parts of the record suggest that the stop was much longer.

Significantly, it was the DEA agents who told Racki that the car was "doing 80 mph," even though there is no indication that they were close enough to the vehicle to clock its speed. Racki relayed the information to Berlo. Berlo drove behind the vehicle, and not surprisingly, confirmed that Siri's car was going between 80 and 85 mph, because that was the speed of his own vehicle. He also claimed to have observed the suspect vehicle following another car "too closely." He then activated his blue lights. The driver of the car immediately complied.

At the stop, Berlo exited his vehicle and went to the driver's side of the Alix-Siri car. Berlo took the license from Siri, the operator, first, and then he asked for the registration. The passenger reached into the glove compartment and took it out. Berlo testified that Siri appeared nervous, more nervous than the usual driver stopped by the police. Berlo then went back to the cruiser to call in the license and the car registration, and to get further instructions from Racki. Berlo asked Racki "what they wanted me to do at this point," and Racki "informed me that there was . . . Oxycodone inside the motor vehicle." Evidence Hr'g. Tr., Day 2, at 63-64. At this point, claiming that he feared for his safety, Berlo called for backup. There was no basis in the prior surveillance by the DEA, in the overheard conversations, or in the encounter itself for believing that either individual was armed. The car's occupants were entirely cooperative. Berlo admitted that he called for backup because "they" (now both individuals in the car) were nervous, and he "feared for his safety." Later, he added that he ultimately frisked the driver and the passenger, just because it was a narcotics investigation.

Berlo then approached the passenger's side of the car, seeking identification from Alix, who complied. Berlo conveyed the information as to the passenger's identity to Racki. There was no issue either concerning the regularity of the defendants' identification or the car's

registration.  Berlo asked Alix, the passenger, if he could search the car for guns, and Alix refused.  Berlo then ordered Alix to step out for "safety purposes" and patted him down, leaving Siri -- the one who supposedly appeared particularly nervous -- alone in the car.  Nothing was found.

At this point, backup officers arrived.  Berlo left Alix standing by the door and Siri in the driver's seat in order to confer with the backup officers.  He related to them that this was a narcotics investigation and that there may be a weapon in the car.  Again, there was no basis for the latter statement.  One of the officers asked Alix a second time if he would consent to a search of the car for weapons, and Alix refused.  The officer frisked Alix a second time, also without results.  Berlo called Racki again, after which he ordered Siri to get out of the car.  Siri did so dragging his leg, as Berlo reported.  Berlo believed that Siri was hiding a gun, pushed him against the car and did a quick pat down.  During the push, a package containing drugs fell out of Siri's pant leg.  Berlo asked Alix if the car could be searched -- the third request -- (asking Alix because Alix spoke English and Siri did not).  Alix declined.

A drug sniffing dog who had been brought by Berlo, who was an officer in the canine unit, discovered a quantity of Oxycodone -- 15 to 20 feet beyond Siri's car.  Berlo showed the passenger the pills and asked if they were his.  Alix answered, "I don't know."

Berlo then told Alix and Siri that he was not holding them responsible for the pills because no one saw either of them throw them out of the car.  He reported to Siri that he would not arrest him for the drugs found on him unless the drugs tested positive for an illegal substance.  At that point Berlo issued a ticket for driving too closely and speeding.  (Exhibit 6.)

Berlo never forwarded the ticket to the Registry of Motor Vehicles.  Although Berlo testified that he had both estimated and clocked the speed, on the ticket "clocked 3/4 M" is written in section C., yet in section D., rather than checking "clocked" Berlo checked "estimated."  And in another report, for which Berlo was the source (Exhibit 9), he reported that "subsequent search of the MV [motor vehicle]" reveals 1000 + grams class B cocaine and 1000 + tablets of OC."  Berlo concedes that this was false.

### 4.      June 5 Telephone Call at 2:37 p.m.

Alix called Canelo's telephone describing the encounter with the police.  He admitted that they had thrown the pills out of the car window but the drug sniffing dog was able to find them. (Exhibit 9.)  DEA reports refer to this call as "minutes after" the motor vehicle stop, which would mean that the stop lasted over an hour.  (Exhibit 9.)

## III.    LAW

### A.      <u>Legitimacy of the Stop</u>

I do not find the testimony of Berlo credible on the question of whether Siri was violating any of the traffic laws.  He was informed by the surveilling DEA agents, who wanted the state troopers to effect a traffic stop, that the Alix-Siri car was "doing 80."  Everything about his testimony and the paperwork of the stop, suggests that he was repeating what he had been *told*, not what he had *observed*.  And as far as following "too closely," that testimony likewise seemed contrived.

Nevertheless, I do find that the stop was lawful because there was reasonable suspicion that the Alix-Siri vehicle had illegal drugs in it.  By the time of the stop, the officers had reason to believe a) Canelo was involved in the drug dealing, b) the gray Audi SUV with registration

matching the registration seen at Canelo's house for a drug delivery was also observed at the

Harrison County courthouse, this time linked to the defendant Alix, c) the May 31 telephone

conversation reported that there would be a delivery on the very day of the stop, June 5, 2007

(although the officers did not know who the participants were, apart from Canelo, at the time of

the call), d) surveillance placed the SUV on the road to eastern Massachusetts precisely on the

day in question.

I do not consider the June 5, 12:49 p.m. call to be part of the basis for the stop for the

reasons described above.  Nor can information gleaned by the contract employees of DEA be

counted as information known to DiTullio, as I describe below.  While the First Circuit has found

that, "[u]nder the 'fellow-officer' rule, law enforcement officials cooperating in an investigation

are entitled to rely upon each other's knowledge of facts when forming the conclusion that a

suspect has committed or is committing a crime," United States v. Meade, 110 F.3d 190, 193

(1st Cir. 1997), there are limitations.  Collective or pooled knowledge derives from two sources

-- "(1) by tracing the arresting officer's action back to an individual in a law enforcement agency

who possessed information sufficient to establish probable cause, and (2) by finding that the

directing agency as a whole possessed the necessary facts." Meade, 110 F.3d at 194.  The first

category can be described as vertical collective knowledge and the second as horizontal

collective knowledge.  United States v. Chavez, 534 F.3d 1338, 1345 (10th Cir. 2008).

### 1.    Vertical Collective Knowledge: Trooper Berlo Under the Direction of Agent DiTullio

It is well settled that an agent or officer who possesses information that amounts to

reasonable suspicion or probable cause may impute that knowledge to another officer or agent so

long as the second officer is under that officer's direction.  See United States v. Barnes, 506 F.3d 58, 63 (1st Cir. 2007) ("Specifically, reasonable suspicion can be imputed to the officer conducting a search if he acts in accordance with the direction of another officer who has reasonable suspicion.") (citations omitted); Meade, 110 F.3d at 193 ("[W]hen a law enforcement officer with information amounting to probable cause directs an officer who lacks the knowledge to make the arrest, we 'impute' to the arresting officer the directing officer's knowledge.") (citations omitted).  The First Circuit has specifically found that "knowledge may be imputed from the DEA agents to the state police who actually effectuated the stop under the 'fellow officer rule.'" United States v. Capelton, 350 F.3d 231, 240 (1st Cir. 2003) (citations omitted); see also United States v. Hensley, 469 U.S. 221, 231 (1985) ("[W]hen evidence is uncovered during a search incident to an arrest in reliance merely on a flyer or bulletin, its admissibility turns on whether the officers who issued the flyer possessed probable cause to make the arrest").  Since Berlo was operating under DiTullio's direction, the question is whether or not DiTullio possessed the requisite knowledge to permit the stop on June 5, 2007.

### 2.      Horizontal Collective Knowledge: Whether the Knowledge Held by the Wire Room Agent Can Be Imputed to Agent DiTullio

Whether knowledge can be imputed horizontally here from the contract workers in the wire room to DiTulio -- remains an open question in the First Circuit.  Meade, 110 F.3d at 194; see also United States v. Ramos, No. 04-10198, 2008 WL 4117184, at *11 (D. Mass. Aug. 29, 2008).  To be sure, the Court in Meade suggested that it was reasonable to be skeptical of an interpretation that focused on an agency's knowledge as a whole.  110 F.3d at 194.  It stated that "the collective-knowledge corollary of the fellow officer rule would seem to require, or at least

presuppose, the flow of information from the officers with knowledge of facts tending to establish probable cause to those lacking that knowledge." Id. See also United States v. Cook, 277 F.3d 82, 86 (1st Cir. 2002); United States v. Fiasconaro, 315 F.3d 28, 36 (1st Cir. 2002).[8]

In the instant case, there is no evidence that the DEA agent in the wire room was aware of the June 5, 12:49 p.m. conversation prior to the stop. Nor was there anything in the record demonstrating that the wire room agent contacted DiTullio or anyone else in the agency with the information. There was none of the "flow of information" that the Meade Court indicated buttressed the collective knowledge doctrine. See Meade, 110 F.3d at 194. Thus, I find that June 5, 2007, call at 12:49 p.m. cannot support a finding of probable cause or reasonable suspicion to stop the Siri-Alix car.

**B.      Duration of the Stop**

The Supreme Court has held that "a detention might well be so lengthy or intrusive as to exceed the permissible limits of a Terry stop." United States v. Hensley, 469 U.S. 221, 235 (1985); see also United States v. Sharpe, 470 U.S. 675, 693 (1985) ("A Terry stop valid at its inception may become unduly intrusive on personal liberty and privacy simply by lasting too long."); United States v. Ogden, 703 F.2d 629, 634 (1st Cir. 1983) ("inquiries undertaken pursuant to a Terry stop must be reasonably related in scope to the justification for their initiation"). In Sharpe, the Court held that "our cases impose no rigid time limitation on Terry

---

[8] The Tenth Circuit addressed this issue in United States v. Chavez and found that in instances where horizontal collective knowledge is argued, "the court must consider whether the individual officers have communicated the information they possess individually, thereby pooling their collective knowledge to meet the probable cause threshold." 534 F.3d at 1345.

stops," but instructed courts to consider (1) the law enforcement purposes to be served by the stop and (2) the time reasonably needed to effectuate those purposes.  470 U.S. at 685.  This boils down to an examination of "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."  Id. at 686.

In Sharpe, the Court concluded that the scope and duration of the stop was lawful, where there was no evidence that the officers were dilatory in their investigation.  Officer Thrasher and DEA Agent Cook were following two vehicles that they suspected of narcotics activity.  The two vehicles split off from each other, and the law enforcement officials followed.  Agent Cook detained one suspect (Sharpe) while Thrasher detained the other (Savage) a half a mile up the road.  Thrasher held the second suspect for twenty minutes while waiting for Cook to arrive. Within minutes after arriving at Savage's vehicle, Cook smelled marijuana, executed a search, and recovered drugs.  Thrasher was right to detain the suspect while waiting for Cook, who had training and experience in narcotics investigations.  And, "[t]he delay in this case was attributable almost entirely to the evasive actions of Savage, who sought to elude the police as Sharpe moved his Pontiac to the side of the road."  Id. at 698-99.

At the other extreme, in United States v. Place, 462 U.S. 696 (1993), the Court found an overly intrusive Terry stop.   A man standing in line at the Miami airport aroused the suspicion of law enforcement officers.  He consented to a search of his suitcases, but they decided not to search because his flight was about to depart.  When he landed in New York, DEA agents asked to search his bags, but he refused.  They then detained him for 90 minutes and moved his bags

from one New York airport to another and used a drug-sniffing dog on the bags while they waited for a warrant.

The Court found the detention unreasonable, noting that "the length of the detention of respondent's luggage alone precludes the conclusion that the seizure was reasonable." Id. at 709. The Fourth Amendment violation was exacerbated by the agents' failure to tell the defendant where they were taking the luggage, how long they would keep it, and how they would return it to him. The Court found that the agents who conducted the detention knew which plane the defendant was on and when his flight was to arrive. They had time to arrange for a warrant and a timely stop and search. Thus, they failed to diligently pursue their investigation.

In Ogden, the First Circuit confronted a 40-minute detention of four tractor-trailer trucks in an investigation of a drug smuggling scheme, which it found to be lawful because of the number of vehicles and people involved. 703 F.2d at 634. There were ten people in the four vehicles, and police had to obtain license and registration from each truck and identification from each passenger. The court even suggested a full hour would have been reasonable. Id. Likewise, in United States v. Quinn, 815 F.2d 153 (1st Cir. 1987), the court found that the evolving circumstances of the stop justified its length and scope. DEA agents arrested individuals outside a stash house, finding five barrels of marijuana in a car leaving the house. Two agents left the house to obtain a search warrant and involve the local police; three stayed behind. The house's occupant was not home. Later that night, a car pulled up to the house. The driver and passenger explained that they were visiting the house because they were considering renting it. Five minutes later, the two agents returned and parked behind the

recently-arrived car.  Twenty minutes later, an officer had a drug-sniffing dog sniff the car, and

the dog stopped at the trunk.  The driver gave consent to search at that point, and the agents

found marijuana seeds inside.  Parking behind the defendants, the court reasoned, was a normal

incident of the existence of a driveway.  The court held that the stop had not been transformed

into an arrest, requiring Miranda warnings.  Nor was it unreasonably long:

> Here, we see no way that the agents could have greatly shortened
> their inquiry if they were to 'confirm or dispel their suspicions'
> meaningfully.  The level of reasonable suspicion was such as to
> warrant a thorough, rather than a cursory, check.  Compare United
> States v. Jodoin, 672 F.2d 232, 235 (1st Cir. 1982) (longer
> detention of suitcase justified where there was cause for
> reasonable belief that suitcase contained drugs).  Perhaps if
> Steadman had had only very weak grounds for suspicion, he
> should, as the court below suggested, have dismissed Quinn and
> Streifel after one or two questions.  But Steadman had not only
> reasonable grounds, he had very strong grounds, approaching
> probable cause, for suspicion.  We believe it would have been
> unreasonable to have sent Quinn and Streifel on their way after a
> few perfunctory questions, especially as the two suspects'
> divergent answers as to how they had met raised rather than
> lowered the level of suspicion, inviting further inquiry.  We
> conclude that Steadman and his associates did no more than
> 'diligently pursue a means of investigation that was likely to
> confirm or dispel [his] suspicions quickly.'

   In Flowers v. Fiore, 359 F.3d 24 (1st Cir. 2004), officers stopped a defendant who

matched the description of a black man in a black or gray car who was heading to a local

residence to "start some trouble."  Pursuant to police procedure, they directed him to kneel on

the ground, handcuffed him, frisked him, and placed him in the back of their cruiser.  They

searched his car for weapons and any other people.  The stop took at most 15 minutes.  After

finding nothing, they let him go on his way.  The court ruled that police had reasonable suspicion

to make the stop.  It further held that the duration and overall intrusiveness of the stop were

reasonable in the absence of evidence that the officers were dilatory or could have materially

shortened the detention "if they were to dispel their suspicions meaningfully." Id. at 31.

    In United States v. Owens, 167 F.3d 739 (1st Cir. 1999), police detained a car for 50

minutes after pulling it over for speeding.  The court held that "the period of detention was

justified" id. at 749 by the fact that the driver did not have a valid driver's license, that the

officers had to decide whether to permit the passenger to drive a car he did not own, where the

occupants gave conflicting stories about who owned the car.  In effect, this case, like Sharpe, is

one in which the defendants bore some responsibility for the delay in completing the stop.

    The foregoing cases suggest a functional standard as well as a temporal one:  What

degree of intrusiveness and what duration was justified by the rationale for the stop?  Here, the

agents wanted to execute a motor vehicle stop; they were hoping to find drugs incidental to that

stop so that they could use those drugs in their ongoing investigation without disclosing its

existence. They were not about to ask questions about drugs directly; that would let the cat out

of the bag. So they pushed a traffic stop to its limits, and in my judgment, beyond it.

    First, the time between the car stop and the frisking of Siri is not at all clear.  Berlo

testified that he was told by the DEA not to write a formal report which would have recounted

the duration of the stop in some detail.  As a result, he agreed that he was unsure about his

testimony concerning the timing of these events.  In response to the AUSA's question, he stated

that it was at best ten to fifteen minutes between the beginning of the stop and the Siri frisk.

That estimate is difficult to credit given the sequence of events -- talking to the driver, getting the

license and then getting the registration, going back to the cruiser, having a conversation with

Racki and calling for backup, returning to the car, frisking Alix, then talking to the backup

officers and Racki again, frisking Alix again, and then frisking Siri.  While these activities might have taken place expeditiously in the usual traffic stop, this stop was clearly different.  Berlo did not know what to do when the "traffic stop" ruse did not work, when Siri's license and registration checked out and the car's occupants were entirely cooperative.  So he called his supervisor for direction not once but twice, and then kept on pushing -- getting backup officers and frisking multiple times.  If this were only a traffic stop, it would have ended when Siri produced a valid license and registration.  If this were only a drug stop, it would have ended when the occupants were questioned about what was in the car.  Since it was neither, it went on and on.

Indeed, Berlo's estimate is not credible, given other testimony about timing:  Berlo testified that the entire encounter, not just the period between the stop and the discovery of cocaine on Siri, was thirty to forty-five minutes.  But in other evidence, namely, the DEA report (Exhibit 7) and DiTullio's testimony, the second call at 2:37 p.m. (between Alix and Canelo, recounting the stop) was described as occurring only moments after the Siri car pulled away, making the stop and all of its components take place in over an hour.  Accordingly – and further, in light of his statements about why he pulled the car over in the first place – I reject Berlo's testimony about the length of the stop.  It must have been longer than ten to fifteen minutes.

Apart from the duration of the stop, its circumstances are surely intrusive -- frisking the passenger twice, removing the driver from the car to be frisked, calling in backup vehicles -- all without any reasonable basis to believe that either man had a weapon or was dangerous.  In Arizona v. Johnson, 129 S. Ct. 781 (2009), the Court reaffirmed that police may order a driver or passenger out of the car during a lawful traffic stop.  Id. at 786 (citing Pennsylvania v.

<u>Mimms</u>, 434 U.S. 106 (1977); <u>Maryland v. Wilson</u>, 519 U.S. 408 (1997)).  "To justify a patdown of the driver or a passenger during a traffic stop, however," it held, "just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous."  <u>Id.</u> at 784.  The only information that Berlo had here was that this was a narcotics investigation and the passenger seemed nervous.  That surely was not enough to suggest that the defendants were carrying a weapon.

Unlike in <u>Ogden</u>, the situation did not demand a protracted investigation: the officers were dealing with one car and two individuals.  And unlike in <u>Sharpe</u> and <u>Owens</u>, the defendants did absolutely nothing to contribute to the delay.  They answered the officers' questions when asked, and they alighted from the car when so ordered.  Finally, unlike in <u>Flowers</u>, there was no danger of an immediate threat of harm to another person that would necessitate a particularly long or intrusive search.

Candidly, most of the opinions involving time and duration challenges to car stops sustain the actions of the police under various rationale, but there must be limits.  One can pretend that the stop is justified as a traffic stop, so long as the car was actually violating the law.  One can do what is necessary to learn about the occupants during the stop -- questioning, asking for documentation -- so long as one acts consistent with the limited information he has.  What one cannot do is carry the stop beyond its rationale.  Otherwise, more than the traffic stop rationale would be illusory; Fourth Amendment protection would be, as well.

### C.     The Abandoned Drugs

After Siri was frisked and cocaine was found, Berlo used his dog to search the area surrounding the car. At that point, he found oxycodone pills, which neither of the defendants claimed. They did not admit that the pills were theirs during the stop; they did not admit an interest in them during this suppression hearing. As such, neither have standing to challenge their seizure. See Abel v. United States, 362 U.S. 217, 241 (holding that evidence of espionage found in a wastepaper basket could be seized and were admissible because "there can be nothing unlawful in the Government's appropriation of . . . abandoned property); United States v. Sealey, 30 F.3d 7 (1st Cir. 1994) (holding the act of abandoning his firearm while running from a police officer "extinguished his Fourth Amendment claim"); United States v. Kelly, 329 F.3d 624, 929 (8th Cir. 2003) (holding that defendant had no reasonable expectation of privacy in his wallet after discarding it to avoid its discovery right before arrest); United States v. Flynn, 309 F.3d 736, 738 (10th Cir. 2002) (warrantless search and seizure of sack of marijuana was valid because the defendant dropped it out of his car on the highway).

IV.    CONCLUSION

Thus, I conclude that the drugs found as a result of the Siri frisk are hereby suppressed. The drugs found outside the car, however, which neither defendant claimed a possessery interest in, are admissible.

Jose Ramon Alix's Motion to Suppress (document #60) is **GRANTED IN PART AND DENIED IN PART.**

**SO ORDERED.**

**Date:  June 30, 2009**                    */s/Nancy Gertner*
                                             **NANCY GERTNER, U.S.D.C.**